* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the Workers Compensation Act, Chapter 97 of the North Carolina General Statutes.
2. On August 14, 2001, Roger Elbert Toney was employed as a diesel mechanic by Southern Foods Group, Inc. Plaintiff's average weekly wage was $673.20.
3. Southern Foods was insured by Key Risk Insurance Company. There is no dispute about coverage.
4. Toney contends that he suffered an injury by accident that arose on August 14, 2001, during the course and scope of his employment; that he suffered an abdominal hernia and a disabling aggravation of a pre-existing asymptomatic condition of avascular necrosis of the right hip as a result of the injury; that he is entitled to recover medical compensation for treatment of the hernia and the avascular necrosis of his right hip; that he has been totally disabled since September 27, 2001, as a result of the injury; and that he is entitled to temporary and permanent disability benefits from Southern Foods and Key Risk after September 27, 2001.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, Plaintiff was a fifty-six year-old high school graduate who had worked as a diesel mechanic for most of his career. Plaintiff was hired to work for Defendant-Employer in their garage as a diesel mechanic in August 1989. Plaintiff was a "bumper to bumper" mechanic, with the knowledge and ability to work on engines, transmissions, and air conditioning units, as well as the more basic service items on international trucks, tractor-trailers and straight drive trucks.
2. On August 14, 2001, Plaintiff was working on a project to remove and disassemble a Cummings engine from an international tractor. In order to complete his project, and after removing all the ancillary parts, Plaintiff also needed to have the cylinder head lifted off the engine block. The cylinder head weighed about two hundred and fifty pounds. Removal was often, but not always, accomplished by employing a hydraulic jack or "cherry picker," in which a chain is hooked to the cylinder head and the jack lifts it out of the engine compartment. Defendant-Employer employed six diesel mechanics, including Plaintiff; however, Defendant-Employer had only one cherry picker available for use in the diesel mechanic work-area. On the August 14, 2001, a diesel mechanic on another job was using the cherry picker. Since the cherry picker was being used, completion of Plaintiff's work would be delayed if he waited for the availability of the cherry picker. Under these circumstances, it was not unusual for Plaintiff, with the help of his co-workers, to manually lift cylinder heads.
3. On August 14, 2001, Plaintiff and three co-workers, including his shop supervisor Jim Robb, stationed themselves around the engine compartment to manually remove the cylinder head. All four of the workers pulled upward to slide the cylinder head to Plaintiff's left. Plaintiff alleged that he felt pain in the right side of his low back and right hip when he turned and twisted his body to the left with his weight on his left leg. Plaintiff and his co-workers completed the lift and Plaintiff continued to work the rest of that day.
4. In Plaintiff's own estimate, cylinder heads were removed manually, without the use of a cherry picker, twenty percent of the time. In fact, the shop had only purchased the cherry picker a couple of years before the date of his injury. Prior to then, the process of removing a cylinder head was always by hand.
5. There was nothing unusual or different about the way in which the cylinder head was lifted on August 14, 2001, versus other prior occasions. Plaintiff made no comment about pain or problems related to lifting the cylinder head to Mr. Robb until later. Even then, Plaintiff's complaints were related to a lump in his stomach. Plaintiff did not mention any problem with his hip until the following week.
6. Mark Foster, a co-worker and diesel mechanic, confirmed that the common practice was to lift cylinder heads out of the engine compartment by hand before the cherry picker was acquired. While Mr. Foster preferred to use a cherry picker, it was not always available as was the case on August 14, 2001. Mr. Foster confirmed that nothing unusual or unexpected happened during the removal on August 14, 2001.
7. On August 15, 2001, the morning after the removal of the cylinder head, Plaintiff felt pain in his right hip and also noticed a bulge in his stomach area.
8. Plaintiff worked from August 15, 2001 until August 22, 2001, before filing an incident report. Defendants sent him to Dr. Lauren M. Spillman, a board-eligible specialist in occupational medicine. Plaintiff continued working for Defendant-Employer until September 27, 2001, when Dr. Spillman took him out of work. Plaintiff has not worked since September 27, 2001.
9. When Dr. Spillman treated Plaintiff on August 22, 2001, he complained of pain in the right hip, as well as a soft protrusion in his "belly." Plaintiff had full range of motion in abduction, flexion, and extension of the right hip. X-rays showed no evidence of fracture, dislocation, soft tissue abnormality, or changes suggesting erosive or degenerative arthritis. Plaintiff was diagnosed with a right hip sprain/strain and an abdominal hernia. He was placed on light-duty restrictions, advised to return to work, and referred for a surgical evaluation of his hernia. When Plaintiff returned to Dr. Spillman on August 28, 2001, he reported that his right hip was "super better," and his abdominal area was not hurting. At the August 28, 2001 visit, Plaintiff's right hip had full range of motion with "minimal pain with movement, no tenderness, and no joint crepitus."
10. On September 4, 2001 and September 25, 2001, Plaintiff was seen by Dr. Haywood Ingram, a general surgeon with Central Carolina Surgery in Greensboro, North Carolina. Dr. Ingram diagnosed Plaintiff has having a "ventral incisional hernia, symptomatic," and "avascular necrosis of the right hip." He concluded that the hernia warranted elective repair, but the hernia was not an emergency. He wanted the avascular necrosis evaluation to be completed before he could "commit to a ventral hernia repair." On September 30, 2002, Plaintiff called Dr. Ingram's office to report that he had lost his job and once he began receiving disability, he would call to schedule a hernia repair.
11. Plaintiff returned to Dr. Spillman on September 11, 2001, and reported that his right hip hurts after sitting. He had "new findings" of tenderness over the right bursa, decreased range of motion, and pain with stepping up. An MRI was performed on September 20, 2001, which revealed that Plaintiff had avascular necrosis of the right hip femoral head. Plaintiff did not have a fracture of the right femoral head or neck and did not have any evidence of soft tissue injury or abnormality in the right hip region. Dr. Spillman took Plaintiff out of work on September 27, 2001.
12. In his deposition testimony, Dr. Spillman did not offer any expert opinion regarding the causal relationship between lifting the cylinder head and Plaintiff's avascular necrosis. Dr. Spillman noted that Plaintiff's right hip condition was unchanged from August 22, 2001 until September 11, 2001, and did not get worse until September 11, 2001, almost a month after the incident at work.
13. Plaintiff was released to return to work on October 8, 2001, but Plaintiff did not show up for work or call, and was terminated. Plaintiff was terminated due to his violation of Defendant-Employer's policy of "no call, no show." Another reason given for Plaintiff's termination was that his work restrictions prevented him from performing his regular work duties, and Defendant-Employer did not have light-duty work available.
14. Plaintiff then saw Dr. Robert M. James, a family physician with which he had treated before the incident at work. Dr. James began treating Plaintiff in approximately 1999 or 2000 primarily for hypertension and depression, which was related to Plaintiff's service in Vietnam and the death of his wife. During the period he treated Plaintiff in 1999 or 2000, Dr. James noted that Plaintiff was abusing alcohol. When Plaintiff saw Dr. James in January 2001, he also noted that Plaintiff was consuming alcohol heavily, and was smoking two packs of cigarettes a day. Dr. James smelled alcohol on Plaintiff's breath at a subsequent visit in June of 2001.
15. Plaintiff did not see Dr. James again until March 4, 2002, which was after the incident at work on August 14, 2001. Dr. James specifically told Plaintiff at that visit that his avascular necrosis was not related to his work injury. Dr. James's opinion was based on the progressive nature of avascular necrosis, the fact that Plaintiff did not have a hip fracture, and the short period of time between the incident at work and the discovery of the avascular necrosis on Plaintiff's MRI.
16. At deposition, Dr. James opined that Plaintiff's avascular necrosis was not causally related to the incident at work. Although he opined that Plaintiff's problem "may have been exacerbated" by the incident, he testified that his opinion regarding exacerbation was based on Plaintiff's history given that he did not have pain before the incident, but did have pain after it. He also testified that there was nothing in any of the objective studies that indicated the incident at work either caused, or aggravated Plaintiff's avascular necrosis. Dr. James explained that, once bone death in the femoral head begins, there is no way to reverse the course of the disease process. This condition will eventually cause pain and symptoms in an individual regardless of whether the person suffers any intervening trauma. Dr. James was of the opinion that Plaintiff would have eventually had symptoms, would have had to undergo hip replacement surgery, and would have suffered disability, even if this incident at work had never happened.
17. Plaintiff was referred to the Veterans' Administration Hospital in Durham where he had a total hip replacement on May 27, 2003. Dr. Marco Rizzo was the attending orthopedic surgeon for Plaintiff's right hip replacement surgery.
18. Dr. Rizzo was not able to determine from looking at Plaintiff's hip during surgery why he developed avascular necrosis in his hip. According to Dr. Rizzo, there are a number of different known causes of avascular necrosis, including alcohol consumption. There also is a well-known causal relationship between femoral neck fractures and dislocations and the subsequent development of avascular necrosis. In addition, and according to Dr. Rizzo, a lot of cases are idiopathic, meaning there are no known explanations for why the disease develops. Dr. Rizzo agreed that once bone death starts, the progression of avascular necrosis cannot be altered in the vast majority of cases. It is a disease that generally is characterized by the gradual onset of pain and loss of motion over months or years.
19. When asked whether a trauma to the hip that does not cause a fracture or dislocation could lead to avascular necrosis, Dr. Rizzo responded, "[I]t could . . . in theory. It hasn't been documented as much as a fracture, per se. So I don't know. The answer would be, I can't say for sure." When asked whether Plaintiff's avascular necrosis was more likely than not caused or aggravated by the incident at work, Dr. Rizzo opined that Plaintiff "had something happen that led to the pain. . . . Maybe something shifted. Maybe he rotated. . . . But I wouldn't be able to speculate that it definitely caused the avascular necrosis." According to Dr. Rizzo, of the known traumatic causes of avascular necrosis, Plaintiff did not have either a hip fracture or dislocation. He also did not have any evidence of subluxation or blood effusion. However, Plaintiff did have a history of abuse and "significant consumption" of alcohol. He testified that Plaintiff's alcohol abuse could be the cause of his avascular necrosis, totally independent of whether he ever had any incident at work, and the two events could simply be coincidental.
20. Dr. Rizzo admitted that his opinions regarding a causal relationship had been based solely on Plaintiff's allegation that he did not have pain before the incident. Dr. Rizzo could not say that Plaintiff's avascular necrosis was caused by the incident at work, and that he was really only speculating as to his "theory" that Plaintiff's hip rotation while lifting could have aggravated his pre-existing avascular necrosis.
21. The deposition of Dr. Brian Thomas Szura, a board-certified orthopedic surgeon, was taken in this matter. According to Dr. Szura there are three primary causes of avascular necrosis: (a) traumatic, (b) atraumatic, and (c) idiopathic or unknown causes. Of those causes that are traumatic in nature, he explained that these "typically are fairly high-energy injuries" such as dislocations and subluxations that require a significant amount of force or fractures of the femoral neck that disrupt the blood supply. Atraumatic causes include steroid use and heavy use of alcohol or tobacco. Dr. Szura agreed that once avascular necrosis begins, there is no way to technically reverse the process, and most individuals will eventually suffer pain.
22. Dr. Szura opined, to a reasonable degree of medical certainty, that Plaintiff's avascular necrosis was "more likely than not" unrelated to the incident at work and was neither materially nor substantially aggravated by the incident at work. He also opined that the incident at work "more likely than not" did not alter the natural progression of Plaintiff's avascular necrosis. The avascular necrosis would have progressed and Plaintiff likely would have needed hip replacement surgery and suffered some disability regardless of the incident at work. It was Dr. Szura's opinion that the described mechanism of injury was not significant enough to cause avascular necrosis of the hip and the MRI did not show evidence of any acute injury to the bone or surrounding soft tissue. Dr. Szura opined that it was pre-existing and was related to alcohol abuse.
23. Regarding Plaintiff's ability to work, Dr. Rizzo's opined that Plaintiff had recovered from an orthopedic standpoint and was ambulating well after his surgery. Dr. Rizzo thought that under appropriate restrictions, Plaintiff could earn wages and is not disabled from all work. Dr. Rizzo gave Plaintiff the following restrictions: no lifting over twenty pounds, cautioned against squatting or climbing ladders, limited to walking fifty to one hundred feet, ten to twelve times per day, and intermittent standing. Plaintiff had no limits on sitting.
24. Plaintiff admitted that, with the exception of the brief time when Dr. Spillman had him out of work in September 2001, he was not thereafter taken out of work by any physician until his surgery in May 2003. As for the period of time between September 2001 and May 2003, Plaintiff admitted going to the Employment Security Commission and certifying he was ready, willing, and able to work. When Plaintiff was asked about his ability to work, he thought he might be able to obtain employment in some other related field. According to Plaintiff's supervisor Mr. James Robb, auto mechanics often will move into the parts department or do office work to use their knowledge rather than their hands.
25. The deposition of Ms. Allison Crews, a vocational rehabilitation consultant with Carolina Case Management, was taken in this matter. She performed a labor market survey and vocational evaluation report for Plaintiff. This was based on the restrictions provided by Dr. Rizzo, as well as Plaintiff's education, his work experience as a diesel mechanic, and his pre-injury wage rate of $17.50 per hour. Ms. Crews found there were job opportunities available in the local labor market within Plaintiff's restrictions, and opined that Plaintiff was currently capable of getting these jobs and earning wages in his local labor market. While Plaintiff would not likely be able to find jobs earning the same wages as before his incident at work, Plaintiff was capable of earning between $8.00 and $12.00 per hour at the entry-level positions she identified. The wages for these jobs would likely increase over time as Plaintiff gained experience.
26. The greater weight of the evidence establishes that nothing unusual, unexpected or untoward occurred during the manual lifting of the cylinder head by Plaintiff and his co-workers on August 14, 2001. While cylinder heads were not always lifted manually since the purchase of the cherry picker approximately two years before August 14, 2001, they had always been lifted manually before and were still lifted manually on a regular basis. Therefore, manual lifting of cylinder heads was a normal part of Plaintiff's work routine and Plaintiff did not suffer a compensable injury by accident to his right hip arising out of and in the course of employment as defined by the North Carolina Workers' Compensation Act.
27. The greater weight of the evidence establishes that Plaintiff's avascular necrosis was neither caused nor materially aggravated, exacerbated or accelerated by the lifting of the cylinder head at work on August 14, 2001.
28. The greater weight of the evidence establishes that the lifting incident on August 14, 2001, caused an injury due to a specific traumatic incident of the work assigned resulting in hernia; the hernia appeared suddenly; and the hernia immediately followed a specific traumatic incident of the work assigned. Plaintiff's hernia did not cause any disability or need for immediate medical treatment.
29. The record does not contain evidence of when, or if, Plaintiff's hernia was surgically repaired.
30. The treatment provided to Plaintiff was reasonably required to effect a cure, provide relief or lessen his disability resulting from his August 14, 2001 work-related hernia injury.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not suffer a compensable injury by accident to his right hip on August 14, 2001 as defined by the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's avascular necrosis was neither caused nor materially aggravated, exacerbated or accelerated by the lifting of engine parts by Plaintiff on August 14, 2001. N.C. Gen. Stat. § 97-2(6).
3. Pursuant to N.C. Gen. Stat. § 97-2(18), the lifting incident on August 14, 2001, caused an injury resulting in hernia; the hernia appeared suddenly; and the hernia immediately followed a specific traumatic incident of the work assigned.
4. Plaintiff's abdominal hernia arose out of and in the course of his employment with Defendant-Employer and resulted from a specific traumatic incident in his employment on August 14, 2001. N.C. Gen. Stat. § 97-2(18). Plaintiff has not proven that he suffered any disability due to his hernia. N.C. Gen. Stat. §97-2(9).
5. Plaintiff is entitled to have Defendants pay the medical expenses necessitated by his August 14, 2001 hernia injury, for so long as such treatment is reasonably required to effect a cure, provide relief or lessen his disability. N.C. Gen. Stat. §§97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for injury to his right hip due to avascular necrosis is DENIED.
2. Plaintiff is entitled to have Defendants pay the medical expenses necessitated by his August 14, 2001 hernia injury, for so long as such treatment is reasonably required to effect a cure, provide relief or lessen his disability.
3. Defendants shall pay the costs.
This the ____ day of December 2005.
 S/____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/____________________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/____________________ THOMAS J. BOLCH COMMISSIONER